IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MATTHEW "REESE" JARETT,

    Plaintiff,

    v.

DAVID HARPER-HEAD,

    Defendant.

Case No. 2:24-cv-02151-HLT-TJJ

**MEMORANDUM AND ORDER**

    This § 1983 excessive-force case arises out of an underage drinking party that ended badly. Plaintiff Matthew "Reese" Jarett attended the party at his friend's house and drank some alcohol before falling asleep on the couch. Law enforcement believed Jarett was a suspect who had just led an officer on a foot chase. Law enforcement tried to wake him to question him. But Jarett is a heavy sleeper and repeatedly batted their hands away. Defendant David Harper-Head, a deputy with the Anderson County Sheriff's Department, eventually tased Jarett during a struggle to handcuff him. Harper-Head contends that Jarett was not complying with law enforcement orders and was being combative. Jarett counters that any movement in response to law enforcement trying to wake him was involuntary and non-threatening.

    Harper-Head asserts qualified immunity and moves for summary judgment. Doc. 96. He argues there was no constitutional violation because his use of the taser was reasonable under the circumstances and he did not violate Jarett's clearly established rights. The parties disagree about who escalated the situation and whether Jarett posed a threat to officer safety. These questions go to the heart of whether Jarett used constitutionally excessive force. But there is another legal hurdle that Jarett barely addresses (if at all). Jarett must identify clearly established law that Harper-Head violated. This is where he falls short. He carries the burden for both prongs of the qualified-

immunity analysis, and he does not satisfy the second prong even when all facts and disputes are construed in his favor. Harper-Head is therefore entitled to qualified immunity. The Court grants his summary-judgment motion.

I.   BACKGROUND[1]

The parties agree on many of the general background facts about how the underage party was busted. They often do not agree on the inferences to be drawn from those facts. But the Court resolves all factual disputes and reasonable inferences in favor of Jarett.

The relevant events happened late at night on April 16, 2022. Jarett was eighteen years old at the time. He was at his friend Joshua Martin's house. Martin's parents were not home, and several underage kids were drinking alcohol at the house. Martin and three others left the house at some point and drove Martin's golf cart onto the golf course, drinking and listening to music. Jarett had already fallen asleep in the basement before they left. He does not recall what or how much he drank.

Someone called the Garnett Police Department about 11:30 p.m. to report that a group of juveniles was riding around the golf course and being loud. Officer Michael Baumgardner responded to the area. He saw a white male wearing a dark hooded sweatshirt and shorts by the golf cart garages. He identified himself as a police officer and yelled at the male to stop. The male ignored Baumgardner's commands and ran. Baumgardner pursued him on foot and called for back-up. Baumgardner lost sight of the subject and thought he entered the house at 16 Links Drive (Martin's house). Baumgardner rang the doorbell multiple times but no one answered. He retraced his steps and found abandoned beer cans on the ground along the trail he had run.

---

[1] For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party.

2

Meanwhile, back-up law enforcement arrived at the house. Garnett Police Department Officer Scott Polster responded, along with Anderson County Sheriff's Office Deputies Hayden Seabolt and Harper-Head. Baumgardner told them what he had seen thus far. Harper-Head could also see a large amount of alcohol on the kitchen counter through an open window shade.

Baumgardner saw Martin outside the house. Martin admitted that he lived at 16 Links Drive, that he and several underage friends had been drinking, and that the person who ran from Baumgardner was possibly inside the house. Baumgardner explained that he needed to contact the person who ran from him, that he wanted to have a face-to-face discussion to investigate, and that he planned to issue the person a citation at a minimum. Martin called his mother at Baumgardner's request to ask permission for law enforcement to enter the home. She gave permission.

Martin immediately tried to wake Jarett when he went inside the house. He knew Jarett was a rough sleeper, so he "knew a cop trying to come down there to wake him up was not going to be the—be a good thing." Doc. 98-2 at 13. Baumgardner saw Jarett lying on the couch and immediately remarked, "There he is," because he thought Jarett was the person who had run from him ten minutes earlier based on Jarett's body type and clothing. Baumgardner later told the other officers, "This is going to be him," meaning he thought (albeit erroneously) that Jarett was the person who had run from him. There is no dispute that the officers believed Jarett was the runner. The other boys told them he was not, but the officers were operating on Baumgardner's positive identification of him based on seeing the suspect outside roughly ten minutes before.

Baumgardner identified himself as law enforcement to Jarett and repeatedly tried to wake Jarett for two-and-a-half minutes. He tried sternal rubs, which involve rubbing up and down on the sternum with the knuckles of the hand to elicit a response. Sternal rubs are meant to garner a reaction from a subject if they are pretending to be asleep or playing possum. There was no eye

3

movement showing that Jarett was opening his eyes or being consciously responsive. Jarett batted Baumgardner's hand away several times, and Baumgardner remarked in his deposition that Jarett "was very incoherent." Doc. 106-3 at 13. Jarett also grabbed Baumgardner's dominant hand. Baumgardner told him to "stop grabbing me dude," and Martin said, "Reese, chill" to try to get Jarett to stop brushing Baumgardner away. *Id.* at 14. Baumgardner recognized that it was "not a safe position for him to have grabbed me" by his dominant hand and "[n]ot a great situation for me to be in at that point in time." *Id.*

Baumgardner eventually walked away to clear the rest of the basement. He felt it was safe to do so while he waited for EMS to arrive and to see if there was anyone else in the basement needing medical assistance. Baumgardner regarded Jarett's actions as the response of "somebody that was asleep or not fully conscious trying to respond to a stimulus coming towards them." *Id.* at 7. He knew based on prior experience with suspects in an altered state of consciousness that "there's sympathetic reactions that people have when they're not fully conscious that they're not necessarily in control of." *Id.* at 8.

Harper-Head started trying to get Jarett up when Baumgardner walked away. Harper-Head identified himself as law enforcement and repeatedly told Jarett to wake up. He expressed concern that Jarett might have alcohol poisoning and asked Martin how much Jarett had to drink. Martin responded that Jarett was a heavy sleeper and that he did not think Jarett had consumed that much alcohol. Harper-Head thought that Jarett was playing possum and that Jarett hoped "this just goes away if he sits there and continues to do this, which it's not going to go away." Doc. 106-1 at 151.

Jarett brushed Harper-Head's hands away. Harper-Head said, "Dude, watch with your hands." Doc. 98-6 (Harper-Head body camera video). When Jarett batted Harper-Head's hands away again, Harper-Head called Seabolt (the other sheriff's deputy) over. Harper-Head said, "He's

going in cuffs." Doc. 98-7 at 11. Martin told Jarett, "Don't be doin' stuff," and "Reese, you don't want to do this, come on, just wake up." Doc. 98-2 at 16. Martin testified that he tried to de-escalate the situation because the officers started to get upset and more heated, and he did not want to see it go any further.

Harper-Head testified in deposition that he wanted to handcuff Jarett because Jarett was not following commands and had grabbed Baumgardner and batted at Harper-Head. Harper-Head felt that Jarett was getting worse and more combative. Harper-Head tried for about one-and-a-half minutes to get Jarett up before he and Seabolt pulled Jarett off the couch and onto the floor. They directed Jarett to sit up (multiple times) and grabbed his arms. They attempted to secure Jarett's hands, and Harper-Head twice told Jarett to "stop resisting police officers." Doc. 98-6 (Harper-Head body camera video). Martin and/or other juveniles in the background of the video also repeatedly told Jarett to stop. *Id.*

Baumgardner returned to the area when he heard the juveniles telling Jarett to calm down and heard Harper-Head speaking with a raised voice. He then saw the deputies attempting to detain Jarett. There was a struggle. Harper-Head was giving Jarett orders that Jarett was not following. Polster stated in his report that Jarett was "actively resisting" being put in handcuffs. Harper-Head testified, "[I]t can deflate your ego a little bit when you realize an 18-year-old man is giving, you know, three police officers a good run for their money in arresting him, but he did. So, [Jarett] is a very strong young man." Doc. 98-7 at 9.

The record includes videos of the struggle on and off the couch. One is from Harper-Head's body camera and the other is from Baumgardner's body camera (which shows only the tail end of the struggle). It is difficult to verify from the videos what was happening during the struggle. The scene was chaotic, made more so by the location and movement of the cameras. The audio

5

indicates that the deputies were telling Jarett to stop resisting and there was activity and commotion. Harper-Head describes the struggle as being Jarett's fault. Jarett cannot remember anything between falling asleep and being tased, so he cannot controvert whether he resisted or batted away officers. Doc. 98-1 at 8, 9. Harper-Head states that Jarett hit him in the upper right thigh. But the Court assumes that Jarett did not because the video is unclear and neither Baumgardner nor Martin saw it happen. Polster then told Jarett that he was going to get tased, and two seconds later, Harper-Head applied his taser to Jarett's back for a single five-second cycle in the "drive stun" mode.

The officers were able to get Jarett handcuffed after Harper-Head tased him. They placed him under arrest. He was charged with battery of a law enforcement officer, consumption of alcohol by a minor, and interference with law enforcement.[2] Jarett was placed in a standing position and walked upstairs and outside to a patrol vehicle. Baumgardner again stated that Jarett was the individual who ran from him, which he believed was true at the time. Jarett's blood alcohol content was .091.

There were four other juveniles in the room at the time Harper-Head arrested Jarett. They were all physically and verbally compliant and answered officers' questions. Harper-Head did not believe that anyone else in the room would present a hazard or danger to officers before he arrested Jarett. Martin even affirmatively tried to help officers arouse Jarett. Baumgardner told Jarett's friends after Jarett was arrested that, "I don't know what's going to happen to him, I was just going

---

[2] These were the initial charges, but all charges were eventually dismissed except a minor-in-possession charge. The Anderson County District Court approved a three-month diversion agreement. Jarett fulfilled the terms of the agreement, and the charges against him were dismissed on September 26, 2022.

to leave him for EMS but they decided to do whatever they did, so that's between them and him." Doc. 98-4 (Baumgardner body camera video).[3]

## II. STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts view the facts and any reasonable inferences in a light most favorable to the non-moving party in applying this standard. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III. ANALYSIS

Harper-Head seeks summary judgment on qualified immunity. Qualified immunity is a powerful defense for public servants that protects "all but the plainly incompetent or those who knowingly violate the law" from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (internal quotation and citation omitted). A defendant may assert qualified immunity and the plaintiff then bears the burden of showing (1) that the defendant's actions violated a constitutional right, and (2) that the right was clearly established at the time of the

---

[3] Jarett urges the Court to consider additional facts related to Harper-Head's prior employment, discipline, and actions. But the evidence Jarett cites in support is not relevant to the Court's qualified-immunity discussion. First, as discussed below, the Court resolves this case on whether clearly-established law shows that Jarett's actions were unconstitutionally excessive. The Court assumes Jarett has stated a constitutional violation. Second, to the extent Jarett attempts to show that Harper-Head had malicious intent when he decided to tase Jarett, whether Harper-Head's action was reasonable is an objective standard. *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010). Harper-Head's subjective intent is irrelevant. And third, the evidence Jarett cites is evidence of a violent propensity, to suggest that Harper-Head acted in accord with such propensity here. Harper-Head's prior actions are not admissible for this purpose. *See Riggs v. Cory*, 2013 WL 4836813, at *2 (D. Kan. 2013).

violation. *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018). The Court may address either inquiry first. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Perry v. Durborow*, 892 F.3d 1116, 1122-23 (10th Cir. 2018) (assuming a constitutional violation but reversing denial of qualified immunity because the cases cited defined the right at issue at too high a level of generality). Here, the Court exercises its discretion to consider the second qualified-immunity prong first.

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Knopf*, 884 F.3d at 944 (internal quotation and citation omitted). A case directly on point is not required. *Lewis*, 48 F.4th at 1198. Rather, the focus is on whether "a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation and citation omitted). A plaintiff cannot rely on the general existence of a right in the usual case. *See Knopf*, 884 F.3d at 944; *see also White v. Pauly*, 580 U.S. 73, 80 (2017) ("[W]e have held that [the excessive-force cases of] *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'").

Jarett's brief focuses on the first prong of qualified immunity, namely whether Harper-Head's actions violated his constitutional right to be free of excessive force. He emphasizes how genuine issues of material fact can preclude summary judgment in excessive force cases. Doc. 106 at 26-28. But Jarett essentially collapses the qualified-immunity inquiry into only one question; he neglects the second prong. He discusses at length the reasons why Harper-Head's use of force was excessive. And, as part of that discussion, he notes a few cases indicating that tasing an unarmed misdemeanor suspect who is not resisting an officer violates the Fourth Amendment. *See, e.g., id.* at 32-33 (citing *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016); *Masters v. City of Independ., Mo.*, 998 F.3d 827, 834 (8th Cir. 2021). And he cites another case for the general proposition that

8

courts will consider whether an officer's reckless conduct unreasonably created the need for force. *See id.* at 33-34 (citing *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840-41 (10th 1997)). But these cases are discussed in the context of whether Harper-Head violated Jarett's constitutional rights, and Jarett neither connects these cases directly to the event at hand nor discusses how they demonstrate a clearly established right. None of the cited cases address whether the limited use of a taser to subdue a struggling suspect in an altered state of consciousness violates the constitutional right to be free of excessive force. The Court nevertheless discusses the cases cited.

First, in *Perea*, police chased Perea on a bicycle and pushed him off without warning or explanation. 817 F.3d at 1203. They then tased him ten times in two minutes (including after he was subdued) when he had committed a traffic infraction at most. *Id.* They were, in fact, initially only looking for Perea for a welfare check. *Id.* at 1201. Perea resisted once police pushed him off his bicycle by thrashing while holding a crucifix. *Id.* Sadly, he died after the event. *Id. Perea* held that it was clearly established that using disproportionate force on a non-dangerous misdemeanor suspect is unconstitutional. *Id.* at 1204. The appellate court further found that officers may not continue using force after gaining control of a suspect. *Id.* That said, the facts of *Perea* show the use of a taser <u>ten</u> times. And they also show that the officers did not stop after the suspect was subdued. Here, Harper-Head applied the taser once, for five seconds. And there is no indication that Harper-Head continued tasing Jarett after he was under control.[4]

Second, *Masters* was a traffic stop. 998 F.3d at 832. The suspect refused to exit his car. *Id.* at 832-33. Law enforcement tried to physically remove him from the car. *Id.* at 833. The suspect resisted, and the officer tased him for at least twenty seconds. *Id. Masters* found the prolonged

---

[4] Jarett also cites *Wilkins v. City of Tulsa, Okla.*, 33 F.4th 1265 (10th Cir. 2022). There are two reasons *Wilkins* does not represent clearly established law on point. First, *Wilkins* was decided <u>after</u> the night at issue here. The Tenth Circuit issued *Wilkins* on May 3, 2022. The night of the party was April 16, 2022. Second, like *Perea*, *Wilkins* involved continued force (pepper spray in *Wilkins*) after a party was subdued.

tasing for fifteen seconds longer than necessary was excessive because the plaintiff was already subdued. *Id.* at 836-37. *Masters* is a case from the Eighth Circuit and thus falls outside the scope of individual cases[5] used to determine what is clearly established. In any event, *Masters* involved use of a taser for four times as long as in this case and involved continued use of the taser after the suspect was under control. It does not provide clearly established law on point.

Third, *Allen* involved officers who responded to a call about an individual threatening suicide. 119 F.3d at 839-41. The officers found the individual sitting in a car and holding a gun. *Id*. Officers approached the vehicle, but the nature of their approach was disputed. Some witnesses said one officer ran up to the car screaming. *Id.* at 841. Other testimony was that the officer approached cautiously. *Id.* Officers ultimately shot the suspect when he pointed the gun toward them. *Id.* at 839. The Tenth Circuit held that the differences in eyewitness testimony about the officers' approach were material fact disputes about whether "the officers' actions were reckless and precipitated the need to use deadly force." *Id*. at 841. But *Allen* is not to be used broadly to show clearly established law in the absence of "sufficient factual symmetry." *Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 794 (10th Cir. 2022). There is simply no factual symmetry between this case and *Allen*.

These cases do not present factual similarities sufficient to put Harper-Head on notice that his conduct would violate Jarett's constitutional right to be free from excessive force. Baumgardner and the officers believed that Jarett was the suspect who had run from police on the golf course. They suspected that he was faking sleep (at least at first). But they were also concerned Jarett may have had alcohol poisoning. The videos are unclear about all that was happening. They do make clear, however, that Jarett was resisting being woken. They show that he was taking some

---

[5] The Court recognizes it can consider "the weight of authority from other courts." *Knopf*, 884 F.3d at 944.

action with his hands and arms to bat away the officers. And the officers were not the only ones telling Jarett to stop. Martin also repeatedly told Jarett to calm down and stop. Harper-Head announced that Jarett was going to be handcuffed. And after additional struggles getting Jarett handcuffed, Polster warned Jarett that he was going to be tased. Harper-Head then applied the taser to Jarett's back in a five-second drive-stun mode. He did not repeatedly use the taser or use it for an extended period. He did not continue to use it once Jarett was subdued. Once they successfully got Jarett in handcuffs, they led him upstairs. These facts bear little resemblance to the cases cited by Jarett. And Jarett makes no effort to explain how and why the cases he cites would put a reasonable officer on notice that Harper-Head's actions would violate Jarett's constitutional rights.[6]

This Court previously denied Harper-Head qualified immunity when he moved to dismiss Jarett's complaint. At that time, Jarett's allegations were that Harper-Head used the taser as an alarm clock in a private home on Jarett, who was unresponsive, non-combative, unarmed, and sleeping. The Court acknowledged that the record could change with discovery. It has. Most notably, the record shows that Jarett was in an altered state of consciousness and that he was reflexively responding to attempts to raise him. He was combative (even if unconsciously so) and resistive. This is a different situation than the Court considered on Harper-Head's motion to dismiss. But Jarett has not come forth with any cases with similar facts.[7] Of course, the Court

---

[6] Jarett also takes no effort to satisfy this prong by citing cases or developing an argument that some violations are so egregious a case is not required. Regardless, this does not appear to be one of those cases based on the summary-judgment record.

[7] Jarett does discuss the facts of the cases he cites. But he does so in the context of argument that Harper-Head violated his constitutional right. He does not cogently argue that these cases are sufficiently similar to put a reasonable law enforcement officer on notice that Harper-Head's conduct crossed the line from reasonable force to unreasonable force given the circumstances.

understands that a plaintiff need not produce a case with identical facts. *See Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017). But Jarett does not even attempt to tackle this prong with any meaningful or targeted discussion. He has the burden on qualified immunity, and he has not met it. He has not shown a triable issue on whether Harper-Head should have known as a reasonable officer that he was violating a clearly established right.

## IV.   CONCLUSION

Qualified immunity provides important protection to law enforcement officials making split-second judgments impacting their own safety and the safety of others. Once invoked, it requires plaintiffs to carry their burden of showing a constitutional violation and that clearly established law put officers on notice that their actions would constitute a violation of constitutional proportion. Jarett fails to meet that burden, and Harper-Head is therefore entitled to the protection qualified immunity offers.

THE COURT THEREFORE ORDERS that Harper-Head's motion for summary judgment (Doc. 96) is GRANTED. Harper-Head's motion to exclude expert testimony (Doc. 95) is DENIED AS MOOT. The case is closed.

IT IS SO ORDERED.

Dated: February 20, 2026                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE